1

2

3

4

5

6

7                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
8                                      AT SEATTLE

9

10   SAMUEL R. WATKINS,                          CASE NO. CV08-1679JLR

11                     Plaintiff,                ORDER ON MOTIONS

12          v.

13   THE UNITED STATES BUREAU OF
     CUSTOMS AND BORDER
14   PROTECTION,

15                     Defendant.

16                              I.      INTRODUCTION

17          This matter comes before the court on Defendant The United States Bureau of

18   Customs and Border Protection's ("the Agency") motion for summary judgment (Dkt. #

19   15), Plaintiff Samuel R. Watkins's cross-motion for summary judgment (Dkt. # 32), and

20   the Agency's motion for protective order (Dkt. # 30).  Having reviewed the papers filed

21   in support of and in opposition to the motions, the court finds the matter appropriate for

22

disposition without oral argument.  The court GRANTS the Agency's motion for summary judgment (Dkt. #15); DENIES Mr. Watkins's cross-motion for summary judgment (Dkt. # 32); and GRANTS the Agency's motion for protective order (Dkt. # 30).

## II.    BACKGROUND

**A.    Mr. Watkins's FOIA Requests**

This matter arises out of Mr. Watkins's eight Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests for 19 C.F.R. § 133.21(c) Notices of Seizure of Infringing Merchandise ("Notices of Seizure" or "Notices") from the Ports of San Francisco, Miami, El Paso, Seattle, Newark/New York, Los Angeles/Long Beach, and Boston.  (Declaration of Peter T. Lynch ("Lynch Decl.") (Dkt. # 23) ¶ 6; Declaration of Samuel R. Watkins ("Watkins Decl.") (Dkt. # 33) ¶ 1.)  Mr. Watkins's[1] FOIA request to the Port of Seattle sought "[a]ll notices to trademark owners required to be made pursuant to 19 C.F.R. Section 133.21(c), dated during the period January 1, 2005 through July 31, 2007, regarding merchandise seized at the Port of Seattle as being counterfeit, as defined in 19 CFR Section 133.21(a)."  (*See, e.g.*, Watkins Decl., Ex. A-010 (FOIA request sent to Port of Seattle).)  Mr. Watkins made almost identical requests to the remaining six ports identified above.  (*Id.* at Ex., A-011 through 037.)

---

[1] Mr. Watkins is an attorney in the Seattle office of the law firm Davis Wright Tremaine LLP.  (Watkins Decl. ¶¶ 1-2.)  He focuses his practice on helping owners of United States registered trademarks protect their intellectual property against counterfeiting.  (Id.)

According to Mr. Watkins, he did not receive any response or acknowledgment of the FOIA requests he sent to the Ports of San Francisco and Miami, as well as a second request to the Port of Seattle. (Watkins Decl. ¶ 11.) He further contends that the Port of El Paso only informed him that his request had been sent to the FOIA division in Washington D.C., without providing any further information on the status of the request. (*Id.*) The Ports of Newark/New York, Los Angeles/Long Beach, and Boston demanded, as a perquisite to responding to Mr. Watkins's request, that he make an advance payment to cover the processing fees for his FOIA request. (*Id.* at ¶ 12.) The Ports required advance processing fees ranged from $500 to almost $30,000. (*Id.*) In order to avoid paying what he deemed to be exorbitant processing fees for his various FOIA requests, Mr. Watkins limited the breadth of his FOIA requests to cover a shorter time-period. (*Id.* at ¶ 14.)

**B.      The Notices of Seizure**

Commercial importers provide the information revealed in the Notices of Seizure to the Agency when they "make entry" into the United States. (Declaration of Michael Mitchell ("Mitchell Decl.") (Dkt. # 22) ¶ 9.) "Making entry" consists of providing certain information to the Agency, including the port of entry, description of the merchandise, the quantity of merchandise, and the name and address of both the exporter and the importer. (*Id.*) The Agency "scrupulously" maintains the confidentiality of this information because it is important that it receive accurate information from importers. (*Id.* at ¶ 14.) The Agency disseminates this information in the Notices of Seizure only to notify trademark owners upon the seizure of goods bearing a counterfeit mark "that

infringe upon their trademark that has been recorded with [the Agency]." (Declaration of Richard F. Chovanec ("Chovanec Decl.") (Dkt. # 20) ¶ 3.)

The Notices of Seizure include the following information: (1) the date the merchandise was imported; (2) the port of entry; (3) description of the merchandise; (4) quantity of the merchandise; (5) country of origin of the merchandise; (6) name and address of the exporter; (7) name and address of the importer; and (8) the name and address of the manufacturer. (Declaration of Kayla C. Stahman ("Stahman Decl.") (Dkt. ## 16-18), Ex. B.) The eighth item of information is not always known to the Agency and is therefore sometimes excluded from the Notice of Seizure. (*Id.*) In addition to the above information, the Notices of Seizure also include the name of the individual responsible for receiving the Notices on behalf of the trademark holder. (*See, e.g.,Id.*, Ex. B. at SWCBP000001.)

**C.  The Agency's Response**

Peter T. Lynch, the Acting Chief of the Freedom of Information Act Appeals, Policy and Litigation Branch ("FAPLB"), the office within the Department of Homeland Security ("DHS") responsible for managing and responding to administrative appeals of FOIA requests, filed a declaration in this case setting forth the Agency's response for each port that received one of Mr. Watkins's FOIA requests. (Lynch Decl. ¶¶ 1-2.)

1.  Port of Seattle

After receiving Mr. Watkins's July 2007 FOIA request seeking all Notices of Seizure sent by the Port of Seattle to trademark owners over a two and a half year period from January 2005 until July 2007, the Acting Port Director for the Port of Seattle, after

discussions with Mr. Watkins, allegedly narrowed the scope the FOIA request to the past six to eight months and to cover only the type of cargo and the name of the trademark holder. (Lynch Decl. ¶ 7.) Mr. Watkins contends he never made such an agreement. (Compl., Ex. F. at 4-5.)

On September 27, 2009, Mr. Watkins filed an administrative appeal from the decision of the Acting Port Director to only provide limited information in response to Mr. Watkins's FOIA request. (Lynch Decl. ¶ 9.) On appeal the Agency considered Mr. Watkins's FOIA request as originally filed and not with the limitations the Acting Port Director contends Mr. Watkins agreed to. (*Id.*) The FAPLB determined that the Director's decision should be reversed and that all records responsive to Mr. Watkins's original FOIA request should be disclosed to Mr. Watkins with some redactions pursuant to FOIA exemptions (b)(2), (b)(4), (b)(6), and (b)(7)(A) and (C). Mr. Watkins thereafter received the Notices with redactions of the (1) date of the merchandise was imported; (2) port of entry; (3) description of the merchandise; (4) quantity of the merchandise; (5) country of origin of the merchandise; (6) name and address of the exporter; (7) name and address of the importer; and (8) name and address of the manufacturer. (*See, e.g.,* Compl., Ex. F.)

2. Port of Los Angeles/Long Beach

In October 2007, Mr. Watkins sent FOIA requests to the Port of Los Angeles/Long Beach wherein he requested Notices of Seizure from January 2005 through August 2007. (Compl., Ex. H.) In an October 31, 2007 letter, the Port FOIA Officer for Los Angeles/Long Beach advised Mr. Watkins that the estimated cost of complying with

his FOIA request was approximately $30,000, and that Mr. Watkins would be required to pay this amount in full prior to his request being processed. (*Id.*) Mr. Watkins worked with the FOIA Officer to limit his FOIA request and thereby limit the cost of complying. (*Id.*) Mr. Watkins eventually paid $1,777.86 for the Port to process his narrowed FOIA request, but argued that the fee was incorrect because the Port had used the DHS FOIA regulations found at 6 C.F.R. § 5.11 instead of the Agency's fee computation regulations found at 19 C.F.R. Part 103. (*Id.*)

Mr. Watkins immediately appealed the fee computation to the FAPLB on January 4, 2008. (*Id.*) The FAPLB denied his appeal on April 1, 2008, in a letter explaining that the fee computation was appropriate pursuant to 5 U.S.C. § 552(a)(4)(iv) of FOIA, the Uniform Freedom of Information Act Fee Schedule and Guidelines ("Fee Guidelines") found at 52 Fed. Reg. 10,012 (March 27, 1987), and 6 C.F.R. § 5.11. (*Id.*) The Assistant Port Director for the Port of Los Angeles/Long Beach thereafter complied with Mr. Watkins's FOIA request with the same redactions as the Port of Seattle's response—after Mr. Watkins's appeal to the FAPLB—citing the same FOIA exemptions. (*Id.*) Mr. Watkins filed an administrative appeal of this decision but, while his administrative appeal was pending, he filed the instant lawsuit, which stayed the processing of his appeal. (*Id.*)

3. Port of New York/Newark

Also in October 2007, Mr. Watkins sent a FOIA request to the Director of the Port of New York/Newark. (Compl., Ex. J.) Similar to his Los Angeles/Long Beach request, Mr. Watkins sought Notices of Seizure from January 2005 through August 2007. (*Id.*)

Mr. Watkins was informed that it would take four months to process his request and that the estimated cost of complying would be $15,000.  (*Id.*)  Mr. Watkins thereafter narrowed the breadth of his request, paid an advance processing fee of $1,100, and received 62 pages of responsive documents that had been redacted for the same reasons as the redactions in his other requests.  (*Id.*)  Mr. Watkins filed an administrative appeal of the decision to heavily redact the Notices, but before his appeal could be heard, he filed the instant lawsuit, which stayed the processing on his appeal.  (*Id.*)  Mr. Watkins also challenged the fee calculation used by the Director of the Port of New York/Newark to determine the processing fee for his request.

4. Port of Boston

Mr. Watkins made a similar FOIA request to the Port of Boston in October 2007. (Compl., Ex. G.)  The Director for the Port of Boston informed Mr. Watkins that processing his FOIA request would cost approximately $500 and that the records he had requested would likely not be produced because the Director's preliminary assessment was that they were covered by FOIA exemption (b)(4).  (*Id.*)  Mr. Watkins responded by limiting his request to the time-period January 1, 2007, through January 31, 2007.  (*Id.*) There were no responsive documents during this time so the Director provided redacted Notices of Seizure from the December 2006 time-period.  (*Id.*)  The responsive documents were highly redacted pursuant to FOIA exemption (b)(4).  (*Id.*)  Mr. Watkins thereafter filed an administrative appeal of the decision to heavily redact the Notices, while the administrative appeal was pending, he filed the instant lawsuit, which stayed the processing on his appeal.  (*Id.*)

5. Ports of San Francisco, Miami, and El Paso

Shari Suzuki, the Chief of the Freedom of Information Act Appeals of FAPLB, Regulations and Disclosure Law Division, Office of International Trade, for the Agency—the office charged with managing and responding to administrative appeals of initial responses under FOIA—filed a declaration in this matter. (Declaration of Shari Suzuki ("Suzuki Decl.") (Dkt. # 39) ¶ 1.) Ms. Suzuki filed the declaration to explain the process for responding to FOIA requests in the three ports that did not respond to Mr. Watkins's initial FOIA requests. (*Id.* at ¶ 6.)

As explained by Ms. Suzuki, the Ports of Miami and San Francisco did not receive Mr. Watkins's FOIA requests in 2007 and only learned of the requests when Ms. Suzuki contacted the port directors in 2008 to inform them of Mr. Watkins's lawsuit. (*Id.* at ¶¶ 7, 10.) Ms. Suzuki declares that the Ports of Miami and San Francisco now have copies of Mr. Watkins's requests, have already conducted a search for responsive documents, and are prepared to produce the documents once they are told "how to proceed." (*Id.* at ¶¶ 8, 9, 11, 12.) With respect to the Port of El Paso, Ms. Suzuki explains that the port did receive Mr. Watkins's FOIA request and sent to it the FOIA Division headquarters for assignment of a number. (*Id.* at ¶ 13.) The FOIA Division headquarters did not receive the FOIA request from the Port of El Paso. (*Id.*) Having been informed of the lawsuit, the Port of El Paso was to produce the redacted, responsive documents to Mr. Watkins by August 21, 2009. (*Id.*) It is not clear from the record whether these documents have indeed been provided to Mr. Watkins.

# III.   ANALYSIS

## A.   Legal Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets its burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).

"Summary judgment is the procedural vehicle by which nearly all FOIA cases are resolved."  *Los Angeles Times Commc'ns, LLC v. Dep't of the Army*, 442 F. Supp. 2d 880, 893 (C.D. Cal. 2006).  The court conducts a *de novo* review of an agency's response to a FOIA request.  5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989).  The usual summary judgment standard does not extend to FOIA cases because the facts are rarely in dispute and courts generally need not resolve whether there is a genuine issue of material fact.  *Minier v. Cent. Intel. Agency*, 88 F.3d 796, 800 (9th Cir. 1996).  Courts instead follow a two-step inquiry when presented with a motion for summary judgment in a FOIA case.  *Los Angeles Times*, 442 F. Supp. 2d at 893.

First, courts must evaluate "whether the agency has met its burden of proving that it fully discharged its obligations under the FOIA." *Id.* The agency must demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents. *Zemansky v. U.S. Envtl. Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985). Second, if the agency satisfies its initial burden, the court must determine "whether the agency has proven that the information that it did not disclose falls within one of the nine FOIA exemptions." *Los Angeles Times*, 442 F. Supp. 2d at 894. In meeting its burden, "the government may not rely upon 'conclusory and generalized allegations of exemptions.'" *Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1980) (quoting *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973).)

## B. Fee Computation

As explained above, Mr. Watkins alleges that the Agency "cherry-picked" the fee calculations that applied to Mr. Watkins's FOIA request to increase the cost of his request. (Reply (Dkt. # 52) at 11.) Mr. Watkins's position is that the Agency improperly relied on DHS FOIA regulations rather than its own, less-expensive regulations found at 19 C.F.R. Part 103, which is the code section that applies to the production of documents and disclosure of information under FOIA by the Agency, *i.e.*, the Bureau of Customs and Border Protection. 19 C.F.R. § 103.0. The Agency counters that when it was transferred to the Department of Homeland Security in 2003,[2] the DHS regulations for

---

[2] On November 25, 2002, the President signed into law the Homeland Security Act, thereby creating the new Department of Homeland Security, which officially came into existence on January 24, 2003. 64 Fed. Reg. 4056-01.

FOIA became applicable to the Agency and since the Agency never sought approval from DHS to promulgate its own FOIA regulation, it was required to follow DHS's FOIA regulations. *See* 68 Fed. Reg. 4056-01 (setting forth DHS's interim final regulations). Mr. Watkins responds that the Agency never repealed its regulations and therefore they are still enforceable despite the transfer to DHS.

The difference in the two regulations is significant. Section 103.10, the Agency's regulation, provides:

> In general, [t]he fees prescribed in this section are for search and duplication and *under no circumstances is there a fee for determining whether an exemption can or should be asserted*, for deleting exempt matter being withheld from records to be furnished, or for monitoring a requester's inspection of records made available in this manner.

19 C.F.R. § 103.10(a)(1) (emphasis added). The Agency concedes that this regulation has never formally been repealed by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; this regulation is still published in the Code of Federal Regulation.

In contrast, the DHS FOIA fee regulations *require* that fees be charged for "the examination of a record located in response to a request in order to determine whether any portion of it is exempt from disclosure." 6 C.F.R. § 5.11(b)(7). According to the regulation, this includes "processing any record for disclosure (for example, doing all that is necessary to redact it and prepare it for disclosure)." *Id.* The fee "ordinarily shall [be] collected . . . before sending copies of requested records to a requester." *Id.* at § 5.11(a).

The general provisions for the DHS FOIA regulations provide that they apply to all applications for DHS records under FOIA, including "all [DHS] components that are transferred to DHS." 6 C.F.R. § 5.1(a)(2). The regulation exempts from its provisions,

DHS components that have "adopted separate guidance under FOIA . . . ." *Id.* The component, however, only issues its "own guidance under this subpart pursuant to approval by the [DHS]." *Id.* A "component" is defined as a "separate bureau, office, board, division, commission, service, or administration of [DHS]," which includes the Agency. *Id.* at § 5.1(b). The court interprets this regulation as permitting components, such as the Agency, to promulgate its own FOIA regulations so long as DHS has given its approval. Here, the Agency's FOIA regulations were adopted long before it became a "component" of DHS, and long before the inception of DHS, and therefore cannot possibly have been adopted with DHS's approval.

Although Mr. Watkins makes much of the fact that in the last 23 years the Agency has amended part 103 but has not repealed the portion of the regulation it argues is no longer enforceable, the amendments he cites are technical amendments to part 103. For example, Mr. Watkins argues that the Agency amended part 103 in July 2008 but did not make any changes to their so-called "unenforceable" fee provisions, citing 73 Fed. Reg. 40722. The July 2008 amendment to part 103 was enacted to "reflect the change in the agency name and to correct outdated office names, addresses and phone numbers," and to note that the Agency "no longer issues magnetic tapes but instead uses CD-ROMs." 73 Fed. Reg. 40722. The court is not persuaded that the adoption of these "technical amendments" is evidence that the Agency reviewed its FOIA fee schedule and affirmatively determined that they would remain in the regulations.

Although the court notes that the Agency's conduct in failing to amend its regulations to reflect its change in practice once it became a "component" of DHS

suggests potential carelessness on the Agency's part, the court finds that based on the plain language of 6 C.F.R. § 5.1(a)(2), the Agency properly used the DHS FOIA fee provisions. *Id.* (stating that the DHS FOIA provisions apply to all DHS components that are transferred to DHS unless the component adopts its own guidance "pursuant to the approval by [DHS]"). The Agency's FOIA regulation at issue here was in existence long before the Agency was transferred to DHS and there is no evidence that the Agency sought DHS approval to continue to enforce its FOIA fee provisions. Therefore, the court finds that the Agency properly accessed fees for reviewing Mr. Watkins's FOIA request pursuant to 6 C.F.R. §5.11.

## C. Exemption Four (Commercial Information)

The majority of the redactions made to the Notices of Seizure by the Agency were made pursuant to Exemption 4 of FOIA. Mr. Watkins argues that the Agency may not assert Exemption 4 because (1) the exemption does not cover counterfeit goods; (2) the Agency may not pursue competitive harm claims on its own; (3) the Agency waived reliance on Exemption 4 when it disclosed the Notices to the trademark owners; and (4) the Agency provides only "conclusory statement of competitive harm." (Pl.'s Opp'n and Cross-Mot. (Dkt. # 32) at 18-29.)

### 1. Counterfeit Goods

Exemption 4 provides that "trade secrets and commercial or financial information obtained from a person and privileged or confidential" are exempt from disclosure. 5 U.S.C. § 552(b)(4). The Agency contends that the redacted portions of the Notices fulfill the criteria of Exemption 4, in that they contain (1) commercial and financial

information, (2) obtained from a person or by the government (3) that is privileged or confidential. *See also GC Micro Corp. v. Def. Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994). Here, the court finds no genuine dispute regarding elements one and two. The information contained in the Notices of Seizure is commercial information and it is obtained from a person, which is defined broadly to include corporations, state governments, and a wide-range of other legal entities. *See, e.g., Nadler v. United States Dep't of the Army*, 92 F.3d 93, 95 (2d Cir. 1996). The primary dispute in this case resolves around whether the information in the Notices of Seizure constitutes "confidential" information as contemplated by Exemption 4. For the following reason, the court finds that information redacted in the Notices does constitute "confidential" information.

In *National Parks and Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), the Court of Appeals for the District of Columbia Circuit analyzed the meaning of "confidential" as it is used in Exemption 4 and determined that "commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 498 F.2d at 770. This test for defining confidentiality was subsequently

adopted by the Ninth Circuit.[3] *See, e.g., Frazee v. United States Forest Serv.,* 97 F.3d 367, 371 (9th Cir.1996); *G.C. Micro*, 33 F.3d at 1112-13.  The Agency need not show that releasing the documents would cause "actual competitive harm."  *G.C. Micro*, 33 F.3d at 1113.  Rather, the Agency need only show that there is (1) actual competition in the relevant market, and (2) a likelihood of substantial competitive injury if the information were released.  *Id.*

The Agency contends that release of the information contained in the Notices of Seizures creates the likelihood of substantial competitive injury because it would provide competitors, presumably other importers, with valuable insight into "importers' supply chains, patterns of importation and distribution, assessments of customer demands and business relationships."  (Agency Reply (Dkt. # 42) at 10.)  In support of its claim of competitive injury, the Agency filed the declaration of Michael Mitchell.  (*See generally* Mitchell Decl.)  Mr. Mitchell is the current Director of the Agency's Trade Operations Division.  (*Id.* at ¶ 2.)  In this position he oversees "984 import specialist, 400 entry specialist and a number of drawback specialist."  (*Id.*)  In this capacity, Mr. Mitchell explains that the Notices of Seizure contain key information regarding an importer's supply chain.  (*Id.* at ¶ 17.)  For example, many importers expend considerable sums of

---

[3]  Although the Agency cites the alternate test for determining "competitive harm" in cases involving voluntary submissions to the government, *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C. Cir. 1992) (en banc), it offers no argument that the information submitted in the Notices of Seizure in this case is done voluntarily.  (Agency Mot. at 12.)  Nor does the Agency address the issue of whether the Ninth Circuit has adopted this alternate test for voluntary submissions.  *See Frazee v. United State Forest Serv.*, 97 F.3d 367, 371 (9th Cir 1996) (declining to apply Critical Mass to determine competitive harm although recognizing that the test may apply to voluntary government submissions).  Accordingly, the court applies the test set forth in *National Parks*.

money to locate and establish business relationships with manufacturers and suppliers of merchandise in the overseas market place. (*Id.*) Permitting FOIA requests that would disclose the identities of these commercial entities would be, according to Mr. Mitchell, "manifestly unfair and cause substantial commercial harm to the importers who laboriously worked to establish these relationships." (*Id.*) The importer could be cut out "entirely of various business transactions, as consignees or distributors seek to deal directly with the manufacturer, without the importer's participation." (*Id.* at ¶ 18.) Mr. Mitchell also identifies a competitive harm in that disclosure would provide the FOIA requester with information regarding the importers understanding or research on customer demand of a particular product based on patterns of importation and distribution. (*Id.* at ¶ 19.)

Mr. Mitchell's declaration assumes that the importation of counterfeit goods competes in the same market as the importation of legitimate goods. Although the court questions whether these markets actually compete, the court notes that the evidence before it supports the Agency's argument that the Notices of Seizure do not always relate to counterfeit goods nor do they always evidence a liable importer. For example, Mr. Mitchell explained that there are a number of instances in which goods are seized by the Agency, but not forfeited, due to the ultimate finding that the imported goods were non-infringing or that the importer had a legitimate license. (*Id.* at ¶ 24.) The blanket release of these Notices, according to Mr. Mitchell, may lead consumers to believe that the importer identified in the Notice does business in counterfeit goods. (*Id.*)

Mr. Watkins counters that counterfeit trafficking cannot be considered a legitimate business that generates confidential commercial information. (Pl.'s Opp'n and Cross-Mot. at 3.) Indeed, as Mr. Watkins points out the Agency's *Vaughn* Index implies that releasing Notices of Seizure would permit the competitors of counterfeit traffickers to import "*identical goods, i.e.,* more counterfeit goods." (*Id.* at 4.) Mr. Watkins's argument fails to acknowledge the fact that the entities likely harmed by the disclosure, *i.e.,* the submitters of the information, are not the manufacturer of counterfeit goods but the importers of these goods. He also assumes that if one importer is identified in a Notice of Seizure then, (1) it must be liable for trademark infringement; and (2) it must have been aware that the goods were counterfeit. As explained below, the court does not find either of these premises to be supported by the record before it.

First, as explained by the Agency, the Notices of Seizure are not conclusive findings of trademark infringement but more akin to a finding of probable cause. (Mitchell Decl. ¶ 8). The Notices are sent pursuant to 19 U.S.C. § 1526(e), which requires the Agency to notify trademark owners of the seizure of information "bearing a counterfeit mark." (Chovanec Decl. ¶¶ 8-9.) As explained by Mr. Chovanec:

> It should be noted that seizure is not the final stage in the disposition of the accused merchandise. Instead, seizure represents the first step in a process that affords a number of due-process protections to the importer whose merchandise has been seized and can result in the review and overturning of a decision to seize. One such protection is the ability of the importer to challenge the seizure and the determination by [the Agency] that the merchandise bears counterfeit marks. The importer is able to challenge a seizure administratively by filing a petition for remission or mitigation of the seizure in question. The importer is able to raise any legal challenge to the seizure, as well as provide any evidence that supports its claims or establishes that the accused merchandise, in fact, was authorized to bear the

mark. In such cases, the administrative challenge is upheld and the seizure invalidated. Furthermore, the importer also has the option to challenge a seizure in court by seeking judicial forfeiture instead of, or following, administrative review. Accordingly, while [the Agency] seizure does represent a determination by [it] that goods bear a counterfeit mark, it is not a final decision upon which the merchandise is immediately forfeited and destroyed. Instead, it is a determination that can be subject to review administratively or by the courts to determine the sufficiency of the seizure, which can be overturned if found to be invalid.

(*Id.* at ¶ 12.) Accordingly, the court does not agree with Mr. Watkins that the Notices of Seizure provide an unrebuttable presumption that the importer was knowingly engaged in the trafficking of counterfeit goods and thus not entitled to the protections afforded by Exemption 4 of FOIA.

Second, a Notice of Seizure is an *in rem* seizure and is an action against the accused merchandise and not the importer of the merchandise. (Chovanec Decl., ¶ 10.) There is no finding that the importer violated trademark laws or that it had the applicable *mens rea* when it imported the alleged infringing merchandise. (*Id.*) While § 1526(f) provides for civil penalties against a person who aids and abets in the importation of seized merchandise, there is nothing before the court suggesting that any of the importers identified in the Notices of Seizure have been fined pursuant to subsection (f) of the statute. Moreover, the Agency offers testimony that in the majority of cases where the Agency attempted to fine the importer pursuant to subsection (f), the importer argued that it was not aware that the goods were counterfeit. (*Id.*, ¶ 11) This occurs when, for example, the importer believes it is dealing with a licensed distributer of the merchandise. (*Id.*) Thus, the court is not convinced that the importers are knowingly trafficking in counterfeit goods and therefore unworthy of protection from competitive harm.

2.  <u>Agency's Pursuit of Competitive Injury Claims</u>

Mr. Watkins also attacks the Agency's role in pursuing the non-disclosure of this information.  Mr. Watkins cites *Wiley Rein & Fielding v. Dep.'t of Commerce*, 782 F. Supp. 675, 676 (D.D.C. 1992), for the proposition that the Agency may not purse competitive harm claims on its own; it must produce evidence of competitive harm from a business that submitted the information at issue.  (Pl.'s Reply (Dkt. # 52) at 3.)  The court is familiar with the *Wiley Rein*, decision and notes that the D.C. court did not state that the Director of the Office of Aerospace Market Development could not offer testimony regarding competitive harm, only that the testimony offered in that case "was not directly relevant to the call sheets" at issue.  782 F. Supp. at 676.  Although the court agrees that in the typical case the Agency would have affidavits from the submitters of the information objecting to disclosure, the court also notes that the Ninth Circuit has carved out exceptions in cases where the Agency submits a declaration from a declarant that is "very familiar" with the industry at issue.  *See Lion Raisins v. United States Dep't of Agriculture*, 354 F.3d 1072, 1080 (9th Cir. 2004); *see also Church of Scientology of Cal. v. U.S. Dept. of Army*, 611 F.2d 738, 742 (9th Cir. 1979) ("If the agency supplies a reasonably detailed affidavit describing the document and facts sufficient to establish an exemption, then the district court need look no further in determining whether an exemption applies.").

Here, the Agency has submitted the declarations of Richard Chovanec and Michael Mitchell, two Agency officials with extensive knowledge of commercial enforcement activities and intellectual property issues affecting the nation's borders.  The

declarants explain in painstaking detail the ways that the information contained in the Notices of Seizure could be turned to another importer's competitive advantage. Accordingly, the court finds that the Agency's evidence is sufficient for it to assert Exemption 4 on behalf of all the importers identified in the Notices of Seizure for the relevant ports from 2005 through 2007.

### 3. Waiver

Mr. Watkins also contends that the Agency waived its ability to rely on Exemption 4 when it disclosed the Notices of Seizure to the affected trademark owners. (Pl.'s Opp'n and Cross-Mot. at 5.) The Agency provides the Notices to the affected trademark owner pursuant to 19 U.S.C. § 1526(e), which requires the Agency to provide the information to the recorded trademark holder within 30 days of the seizure of counterfeit goods. (*See also* Chovanec Decl. ¶ 7.) This limited disclosure to interested third-parties does not operate to disqualify the information from protection under Exemption 4. This is not a situation where the Agency is "coyly" releasing information once and then refusing to do so again, as implied by Mr. Watkins. Here, the Agency is statutorily obligated to release this information to the affected party. The court therefore does not find that by adhering to its statutory obligations the Agency has waived the confidential nature of the information contained in the Notices of Seizure. *See also Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001).

### 4. Conclusory Statements of Competitive Harm

Finally, the court disagrees with Mr. Watkins that the Agency has provided only conclusory statements of competitive harm. (*See* Pl.'s Opp'n and Cross-Mot. at 24.) The

Agency has come forth with more than adequate information detailing the various harms that could befall importers if the Notices of Seizure were disclosed. As already discussed, the court found that the Agency has provided sufficient detail from knowledgeable sources to support the court's findings regarding the competitive nature of commercial importation, the advantage that would be afforded competitors in the market if given information regarding the submitting importer's supply chain and merchandise market. The court therefore rejects Mr. Watkins's assertions of conclusory statements of competitive harm.

As to Exemption 4, the court concludes that the Agency has met its burden of showing that there is actual competition in the commercial importation market which it defines as "fierce" and that if the Notices of Seizures were released—evidencing an importers supply chain—the importer would likely suffer substantial competitive injury. *See Lion Raisins*, 354 F.3d at 1079.

**D.     Exemption Seven**

In addition to redacting the information discussed above pursuant to Exemption 4, the Agency also redacted the name of the individual identified by the trademark holder to act as the contact for the Agency. (*See* Lynch Decl., Ex. B.) The Agency withheld the contact name citing FOIA Exemption 7(C), the exemption created for law enforcement records that are "expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The Agency relies on this exemption because the Notices of Seizure are created for law enforcement purposes and the privacy of the individuals indentified in the Notices outweighs Mr. Watkins's commercial interest in the

information.  (Agency Resp. at 17.)  Mr. Watkins did not respond to this argument in the

vast briefing filed in opposition to and in support of the motions, so the court is without

the benefit of Mr. Watkins's analysis and may consider his objections to the redaction of

this material to have been abandoned.  *See, e.g., Ramirez v. City of Buena Park*, 560 F.3d

1012, 1026 (9th Cir. 2009).  Regardless, the court agrees with the Agency that the

identity individual acting as the responsible party and contact person for the trademark

holder is private information.  The court further notes that there is nothing before it that

supports a finding that there is any public interest in knowing who these people are.

Accordingly, the court grants the Agency's motion for summary judgment with respect to

the redaction withheld under Exemption 7(c).

**D.**     ***Vaughn* Index and Protective Order**

        Based on a discrepancy in the number of pages identified in the Agency's first and

second *Vaughn* indices, Mr. Watkins argues that he should be permitted to conduct

additional discovery in this matter.[4]  The Agency moves for a protective order stating that

discovery in FOIA cases is the exemption and not the rule and that Mr. Watkins fails to

establish a need for additional discovery.  The Agency further explains that the

---

        [4] The "Vaughn index" takes its name from the District of Columbia Circuit's decision in
*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).  *See also Bowen v. U.S. Food & Drug Admin.*,
925 F.2d 1225, 1227 n.1 (9th Cir. 1991).  In *Vaughn*, the D.C. Circuit rejected an agency's
conclusory affidavit and required the agency to provide detailed support for its claimed FOIA
exemptions.  *Vaughn*, 484 F.2d at 826-28.  Under Ninth Circuit precedent, "[a] *Vaughn* Index
must: (1) identify each document withheld; (2) state the statutory exemption claimed; and (3)
explain how disclosure would damage the interests protected by the claimed exemption."
*Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325, 1326 n.1 (9th Cir.
1995).

pagination differences were based on a clerical error and not the product of an "inadequate search" as alleged by Mr. Watkins.

As a general rule, "[d]iscovery in FOIA is rare and should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains." *Schrecker v. Dep't of Justice*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002), *aff'd*, 349 F.3d 657 (D.C. Cir. 2003); *see also Judicial Watch, Inc. v. Dep't. of Justice*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002) (noting that "[d]iscovery is not favored in lawsuits under the FOIA"). In *Lewis v. IRS*, 823 F.2d 375, 378 (9th Cir. 1987), the Ninth Circuit explained that the *Vaughn* index submitted by the agency to support the withholding of records is the factual predicate upon which the court makes its ruling as to whether a given document is or is not within a statutory exemption, and "if the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption, the district court need look no further." *Id.* (citing *Harvey's Wagon Wheel, Inc. v. NLRB*, 550 F.2d 1139, 1141-42 (9th Cir. 1976)).

Although Mr. Watkins also argues the merits of the Agency's decision to redact the Notices of Seizure as the basis for his discovery request,[5] the only evidence of bad faith that Mr. Watkins relies on, that could support a motion for additional discovery, is

---

[5] Mr. Watkins contends that his discovery requests seek to "challenge the Agency's conclusory and generalized reliance on Exemption 4 and expose [its] bad faith in withholding records that it does not internally treat as containing confidential commercial information." (Pl.'s Opp'n and Cross-Mot. at 5.) The facts relied upon for making this assertion are the same as those considered by the court in the discussion of Exemption 4. The parties do not dispute that the Notices of Seizure are provided to trademark holders. This area of consideration does not require additional discovery but may be weighed based on the affidavits provided by the parties and the Vaughn index.

the conflicting *Vaughn* indices.  The reason for the conflicting indices is more than

adequately explained, however, in the Declaration of Shannon K. Connery.  Ms. Connery

is a Paralegal Specialist in the U.S. Attorney's Office located in Seattle, Washington.

(Declaration of Shannon K. Connery ("Connery Decl.") (Dkt. # 38) ¶ 1.)  Ms. Connery

explains in her declaration that she assisted the Agency's attorney, Kayla Stahman, in

preparing the first and second *Vaughn* indices, as well as preparing the documents

referenced in each *Vaughn* index.  (*Id.* at ¶ 2.)  When Ms. Connery organized and bates-

stamped the documents used for the first *Vaughn* index, she mistakenly included two

copies of several, but not all, of the documents—a redacted copy and an unredacted copy.

(*Id.* at ¶ 2.)  Ms. Connery realized her mistake when she began preparing the second

*Vaughn* index and promptly reorganized the documents to include only one copy of each

document.  (*Id.* at ¶ 4.)  As noted by Ms. Connery: "The discrepancy in the number of

documents in the two *Vaughn* indexes is due entirely to my mistaken inclusion of

duplicate copies of documents in the first index."  (*Id.* at ¶ 9.)

The court finds no basis for discounting Ms. Connery's explanation of the

discrepancy of documents and therefore denies Mr. Watkins's request for additional

discovery based on the Agency's bad faith or on what he believes is indicative of an

inadequate search for relevant documents.

# IV. CONCLUSION

For the foregoing reasons, the court GRANTS the Agency's motion for summary judgment (Dkt. #15); DENIES Mr. Watkins's cross-motion for summary judgment (Dkt. # 32); and GRANTS the Agency's motion for protective order (Dkt. # 30).

Dated this 30th day of October 2009.

JAMES L. ROBART
United States District Judge